```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :      16cv3220 (DLC)
EMPOWER ENERGIES, INC.,                :
                      Plaintiff,       :      OPINION AND ORDER
                                       :
              -v-                      :
                                       :
SOLARBLUE, LLC, DYNAMIC ENERGY         :
SOLUTIONS, LLC and Does 1-20,          :
                                       :
                      Defendants.      :
                                       :
-------------------------------------- X
```

Appearances:

For Plaintiff:
Andrew Levine
Katharine Wright Bryant
J. Noah Hagey
BraunHagey & Borden LLP
220 Sansome Street, 2nd Floor
San Francisco, CA 94104

For Defendant Solar Blue:
Michael C. Hefter
Ryan M. Philip
Benjamin Z. Koblentz
Bracewell LLP
1251 Avenue of the Americas
49th Floor
New York, NY 10020

For Defendant Dynamic:
Daniel E. Rhynhart
Andrew T. Hambelton
Jeffrey C. Hoffman
Blank Rome LLP
405 Lexington Avenue
New York, NY 10174

DENISE COTE, District Judge:

This action arises from a breach of contract dispute between plaintiff Empower Energies, Inc. ("Empower") and defendants SolarBlue LLC ("SolarBlue") and Dynamic Energy Solutions LLC ("Dynamic").  Empower sought the rights to develop a solar energy project in Framingham, Massachusetts (the "Project"), and entered into a contract with SolarBlue for that purpose.  It alleges that SolarBlue breached the contract and that Dynamic tortiously interfered with that contract.  Empower moved for a preliminary injunction on August 23, 2016.  A hearing on the motion was held on September 16 and 20, 2016. For the following reasons, the motion is largely denied.

## PROCEDURAL HISTORY

Empower filed this action on April 29, 2016, alleging that SolarBlue breached its obligations to Empower under their Asset Purchase Agreement ("APA").  It seeks damages in excess of $10 million.  Empower amended its complaint on May 3.  On May 24, Empower sought expedited discovery in aid of its anticipated motion for preliminary injunctive relief.  During expedited discovery, Empower learned that Dynamic had obtained the very rights to pursue the Project which Empower had sought unsuccessfully, and on July 20 it added Dynamic as a defendant. The Second Amended Complaint ("SAC") alleges that Dynamic

intentionally induced SolarBlue to breach or otherwise render performance of the APA impossible.

On August 16, the magistrate judge assigned to this case ordered the plaintiff to file its motion for a preliminary injunction by August 23.  The action was transferred to this Court on August 18.  At a conference on August 23, Empower submitted its motion for a preliminary injunction and the hearing was scheduled for September 16.  In its motion, Empower seeks to enjoin SolarBlue and Dynamic from performing any further work on the Project, to require them to stop using and to return Empower's confidential and proprietary information, and to deposit monies paid to SolarBlue and Dynamic in an escrow account pending resolution of the litigation.  On September 2, defendants SolarBlue and Dynamic each filed a brief and evidence in opposition to the motion.  A reply was filed by Empower on September 9.

After the scheduled briefing was completed, Empower asked and received permission to supplement the record with newly obtained information that Dynamic had acquired rights to the Project by agreeing to pay a bribe.  On September 12, Empower filed a declaration from Anthony Parisi ("Parisi"), former Chief Financial Officer of Dynamic, explaining that in March 2016 Jeffrey Cain ("Cain"), SolarBlue's Chief Operating Officer ("COO"), had solicited and Dynamic had agreed to pay a bribe to

Cain to obtain rights to the Project.  Parisi asserted that
numerous statements in the declarations of Daniel Dus ("Dus"),
Chief Development Officer of Dynamic, and Cain, which the
defendants had submitted on September 2, were knowingly false.
Parisi revealed that he had been in litigation with Dynamic over
the bribery and related issues since resigning from Dynamic on
April 4, 2016.

Dynamic promptly denied that any of its submissions had
been false.  Dynamic filed a supplemental declaration from Dus
on September 14.  SolarBlue responded differently.  It notified
the Court that it had not known of Parisi's allegations or the
litigation between Parisi and Dynamic until September 12.

A preliminary injunction hearing was held on September 16
and 20.  Without objection from the parties, the hearing was
conducted in accordance with the Court's customary practices for
non-jury proceedings, which includes taking direct testimony
from witnesses through affidavits submitted with the preliminary
injunction papers.  The parties also served with the preliminary
injunction papers copies of all exhibits and deposition
testimony that they intended to offer as evidence in chief at
the hearing.

Empower provided declarations from William Morrow
("Morrow"), Executive Vice President of Business Solutions for
Empower, and Parisi.  SolarBlue provided declarations from Brett

Roland ("Roland"), Senior Vice President of Real Estate, Construction & Facilities for ADESA, Inc. ("ADESA"), and Cain. Dynamic provided two declarations from Dus.

Before opening statements at the hearing on September 16, and citing Rule 3.3 of the Rules of Professional Conduct, which relates to the duty of candor before a tribunal, counsel for SolarBlue withdrew Cain's declaration and renounced any reliance on it.  It reported that Cain had obtained separate counsel.

During the hearing, Empower called Morrow and Parisi as its witnesses, and the defendants cross examined them.  SolarBlue offered testimony from Roland, and he was cross examined.  The final hearing witness was Dus.  In the midst of Empower's cross examination of Dus, Dynamic asked for an adjournment of the proceedings, which was granted.

When the hearing recommenced on September 20, Dynamic informed the Court that Dus would not testify further and that he had obtained separate counsel as well.  Its request to retain portions of his testimony in the record was denied.[1]  Both of Dus' declarations and his remaining testimony were stricken from the record.

---

[1] Dynamic moved to admit only paragraphs 7 and 21-38 of Dus' original declaration.  These passages discussed the harm that would befall Dynamic, third parties, and the Project as a whole should the injunction be granted.

This Opinion presents the Court's findings of fact and conclusions of law.  The findings of fact appear principally in the Background section, but also appear in the remaining sections of the Opinion.

**BACKGROUND**

Empower is a renewable energy service company that specializes in solar power development and installation.  It finances, designs, builds, and operates commercial and industrial-scale solar projects in the United States, including six in Massachusetts.

The industry in which Empower operates is highly competitive.  Because of this, Empower treats its development agreements, including its power purchase agreements ("PPAs"), asset purchase agreements ("APAs"), and lease agreements as confidential.  It also treats its design and construction documents as confidential, including its technical specifications and pricing information.  Empower's technical specifications for the Project took a team of four employees approximately three months to complete.

**SolarBlue Acquires the Project**

The Project is a 4,279.24 kilowatt solar energy generation project located on property owned by an affiliate of ADESA. ADESA manages vehicle auctions for KAR Auction Services ("KAR"), the publicly-traded parent company, at approximately 76

locations in the United States, hosting auctions at least once a week at each site.  Its principal clients are institutional customers such as car manufacturers and car dealers.

In 2012, ADESA began to explore the installation of a solar power facility at the Project site, which is an enormous expanse of parking lots surrounding a former GM manufacturing building in Framingham, Massachusetts.  Between 2012 and 2014, ADESA had unsuccessfully negotiated with three providers to finance the Project.

ADESA agreed in 2014 to lease a portion of its property to SolarBlue for the Project.  ADESA agreed to purchase all of the power produced from the Project for 25 years.  SolarBlue is a commercial scale solar development company that competes in the same markets as Empower.

SolarBlue and ADESA executed a PPA on May 19, 2014 (the "PPA").  The PPA contemplates the installation of a large solar project on the rooftop of the former GM plant.  The PPA gives ADESA the right, inter alia, to approve any assignment by SolarBlue of rights under the PPA to any third party.  Because it had taken ADESA roughly two years to identify a partner for the Project, it was important to ADESA that it retain the right to control the assignability of the PPA.  Under the PPA, however, ADESA could not "unreasonably withhold consent from an assignment."  Following execution of the PPA, SolarBlue retained

7

Zona Power, LLC ("Zona") and with the assistance of Zona development consultant Jeffrey Wootan ("Wootan") began to design and engineer the Project.

**October 2015 Asset Purchase Agreement**

In the spring of 2015, SolarBlue began to discuss the Project with Empower, and they entered into a non-binding Letter of Intent.  While the PPA contemplated a rooftop project, it quickly became clear that the roof was not suitable for installation of solar equipment, and the Project would instead be constructed as a carport canopy or "ground mount" project on a portion of the parking lot, with the solar panels installed on top of the canopy.  From that point, all documents, negotiations by Empower with others, and all approvals from the regulatory authorities were for a carport project.

On October 6, 2015, Empower entered into the APA with SolarBlue.  The APA describes the Project as the "ADESA Framingham Solar Carport."  Empower understood, and the terms of the APA provided, that it would need to obtain ADESA's consent to SolarBlue's assignment of its rights to Empower.

Empower expected the Project to be profitable.  It anticipated approximately $25 million in revenue during the Project's lifetime, with $5-10 million of that amount constituting the profit that would be distributed among Project participants.  SolarBlue was not entitled to any compensation

from Empower until the deal closed, after which point it would
receive five milestone payments.

During negotiations, SolarBlue's Cain told Empower that
ADESA had many other locations at which it wanted to deploy
solar power.  Empower hoped that the Project's success might
result in further opportunities to work with ADESA.  As of
today, ADESA remains willing to consider Empower for work at
other ADESA sites.

The APA defines SolarBlue as the Seller and Empower as the
Buyer of certain rights.  The APA contains commitments that
SolarBlue and Empower made to each other during an "Interim
Period," which is defined as the period between October 6, 2015
(the effective date of the APA) and the earlier of the Closing
Date, which was to be five days after all of the conditions
precedent have been met or waived by the parties, or termination
of the APA.  In essence, the APA provides Empower with the
opportunity to purchase the Project assets from SolarBlue at
closing by entering into an Assignment and Assumption Agreement.
One critical deliverable to be obtained prior to closing was an
amended PPA, executed by ADESA.

Empower alleges that SolarBlue breached its duties under
the APA of exclusivity, to cooperate fully and in good faith
with Empower to complete the conditions precedent of the APA,
and of confidentiality.  In the exclusivity provision, SolarBlue

agreed that during the Interim Period it would not solicit or

consider a proposal for the Project from parties other than

Empower.  The APA provides that during the Interim Period,

SolarBlue would not

> directly or indirectly, take any action the purpose,
> intent or foreseeable effect or result of which would
> be: (a) the solicitation of a submission of offers
> from any other Person other than [Empower] relating to
> the sale, transfer, conveyance, lease, assignment or
> other disposition of the Project or any Project Asset
> (an "Alternative Proposal"); (b) to respond in any way
> to any Alternative Proposal other than to decline to
> pursue the same; (c) to participate in any discussion
> or negotiations with, or furnish any non-public
> information to, any Person other than [Empower] or its
> representatives regarding any Alternative Proposal; or
> (d) to enter into any agreement or understanding,
> whether oral or in writing, with respect to an
> Alternative Proposal.

Other provisions in the APA imposed on SolarBlue the

obligation to cooperate fully and in good faith with Empower.

For instance, SolarBlue agreed, during the Interim Period, to

"continue to reasonably cooperate with [Empower] to assist

[Empower's] evaluation and development of the Project."

SolarBlue also agreed that it would not "without prior written

consent of [Empower] (which consent may be granted or withheld

in [Empower's] reasonable discretion)" sell, lease or otherwise

dispose of any of the Project assets.  Further, SolarBlue agreed

to "keep [Empower] informed," "consult with representatives of

[Empower] on all material matters relating to the Project," and

"use commercially reasonable efforts to preserve intact the

goodwill and relationships with Persons having business dealings with the Project."  In the APA, SolarBlue agreed as well to, "at Empower's reasonable request," take all actions "reasonably required to fully effectuate" the transaction contemplated by the APA, "including obtaining any third-party consents required . . . to fully vest title and possession of the Project Assets with [Empower]."

The APA also contained confidentiality provisions in which SolarBlue agreed not to "directly or indirectly, use, publish, disseminate, describe or otherwise disclose any [of Empower's] Confidential Information without the prior written consent of [Empower]."  The term "Buyer Confidential Information" is defined as "including any non-public information provided by [Empower] to [Solarblue]," and in particular, "the terms of this agreement."  The APA describes information not considered confidential as follows:

> [i]nformation shall not be deemed to be Buyer Confidential Information if (A) it has become generally known or available within the industry or the public through no act or omission of Seller; (B) Seller can demonstrate that, prior to disclosure . . . the information was already in the possession of Seller; (C) it was rightfully received by Seller from a third party who became aware of it through no act or omission of Seller and who is not known to Seller to be under an obligation of confidentiality to Buyer; or (D) Seller can demonstrate it was independently developed by employees or consultants of Seller.

Finally, the APA contained the parties' agreement that a breach of the APA would constitute irreparable damage.  The APA provides

> that the other would suffer irreparable damage and would not have an adequate remedy at law for money damages in the event that any of the covenants or agreements set forth in this Agreement were not performed by such other Party in accordance with its terms, and therefore each Party agrees that the other Party . . . shall be entitled to specific performance, injunctive and other equitable relief, without the necessity of posting a bond or other security.

## Empower's Work on the Project

Empower developed a design plan for the Project.  It also hired outside consultants, conducted an environmental review, and researched electrical grid interconnection applications and other permit applications.  Empower also altered the original Project design to accommodate ground-mounted solar panels.  The parties expected when they entered into the APA in October of 2015 that an amended PPA with ADESA would be executed by December of 2015.  That did not occur.

A principal reason for the delay in the negotiation of the PPA was Empower's insistence on a demonstration by ADESA that it was credit-worthy and could fulfill its financial obligations under a PPA.  Initially, Empower requested ADESA's parent to personally guarantee the PPA.  Because KAR's financials were publicly available, Empower felt that would give it sufficient assurance that the transaction was financially secure.  When KAR

12

refused, Empower asked for financial information from ADESA
itself.  That information was not publicly available and ADESA
resisted that request as well.

On February 17, Empower provided SolarBlue with a redlined
draft of an amended PPA (the "Draft PPA").  The Draft PPA
contemplated a carport solar project; it removed, for example,
the 2014 PPA's language that dealt with roof repairs and
maintenance.  The Draft PPA also included the price of
electricity for each of the twenty-five years over which it was
envisioned that the PPA would govern Empower's sale to ADESA of
electricity from the Project.  It also included the "termination
values" (or "buyout values"), which were the amounts that ADESA
would need to pay Empower if it wished to terminate the PPA
early.  These values were derived from the anticipated Project
revenues.

By late February, SolarBlue had stopped cooperating with
Empower.  Unaware of the depth of the difficulties it faced,
Empower was still actively working on the Project in March.  On
March 3, Empower sent SolarBlue and ADESA a spreadsheet with
revised termination values for each of the twenty-five years of
the Project, and an explanation and calculations on how it
reached the termination values.  Empower was also still working
with government agencies to obtain the necessary permits and
approvals for the Project.  In a March 21 email, Empower

explained to SolarBlue that the "only open issue is having ADESA
Inc. as the counter-party[,] which we can get over easily if we
can get additional financials on ADESA, Inc[.] to just check the
box that they are what they say they are."

By late March, Empower was well aware that there were
difficulties in proceeding with the Project.  On March 28,
Empower sent an email to SolarBlue to determine whether
SolarBlue would "confirm that you can support closure of" the
Project.  The email observed that SolarBlue had not responded
for three weeks to Empower's repeated efforts to contact it,
that Empower had provided a "final checklist of items" that
awaited a response, that Empower's investors were still waiting
to see ADESA's financials, and that Empower understood that
SolarBlue was "shopping" the Project to others.

**April 1 ADESA Notice**

On April 1, ADESA notified SolarBlue in writing that it
would not proceed with Empower on the Project.  ADESA's Roland
wrote:

> Please let me start by apologizing for the silence
> over the past several weeks.  We have, internally,
> held several high level management conference calls as
> well as meetings and concluded that we will not
> proceed with the . . . Project with Empower Energies
> Inc. involvement.  Please accept this as ADESA's
> formal notification of our desire.

This letter was disingenuous.[2]  By this date, ADESA had known for weeks that SolarBlue had a candidate anxious to replace Empower on the Project.  Indeed, it had been negotiating with Dynamic since at least March 3.

ADESA had been frustrated by Empower's unrelenting demands to see its financials and with the delays in the Project, which it had hoped could begin in January of 2016.  Long before April 1, ADESA had set an internal deadline of April 2016 for proceeding with or abandoning the Project.  As of April 1, ADESA and Empower had been negotiating over roughly five months and still had several open issues, including the seemingly insurmountable demand from Empower of either a parent company guarantee from KAR, which KAR was flatly unwilling to give, or financial information from ADESA, Inc., which ADESA was unwilling to provide.  Empower's Morrow testified at the hearing that as of today Empower would still need to see ADESA's financials in order to commit to the Project.  When SolarBlue presented ADESA with an alternative partner, and one that ultimately offered ADESA a better price than Empower proposed, it decided to abandon its negotiations with Empower.

---

[2] Although ADESA's submissions in advance of the hearing represented that SolarBlue had not offered Dynamic as a replacement to Empower before April 1, that representation was not true.  At the hearing, Roland admitted that he has an email from March 2 in which Dus of Dynamic was copied.

**April 4 Notice of Breach**

On April 4, unaware that ADESA had sent SolarBlue the
letter of April 1, Empower notified SolarBlue in writing that
SolarBlue was in breach of the APA.  Empower warned that it
would pursue its legal remedies unless it received assurances
within three business days that SolarBlue intended "to comply
with its obligations under the APA, including delivery of the
requested financials and assurances that it has ceased and
desisted from marketing the Project."  The five covenants
Empower alleged SolarBlue had breached were "Section 8.2(a) and
(c) (Actions by Seller Prior to Closing), Section 8.7
(Development of Project During Interim Period), Section 8.11
(Satisfaction of Conditions), Section 8.12 (Due Diligence) and,
upon information and belief, Section 8.3 (Exclusivity)."

**April 7 Termination Letter**

On April 7, attorneys for SolarBlue advised Empower in
writing that its client intended to terminate the APA "effective
immediately."  This was the first notice Empower received from
SolarBlue that it intended to terminate the APA.  The letter
explained that on April 1, SolarBlue "received correspondence"
from ADESA stating that it "would not proceed with the Project
with the involvement of Empower."  It proposed that SolarBlue

and Empower enter into an attached settlement agreement,[3] since ADESA's decision not to work with Empower was "out of the reasonable control of Solar Blue."

In mid-April, SolarBlue provided Empower with a copy of the April 1 letter from ADESA. From April to early September, Empower did not contact ADESA to discuss the Project or to learn if it could do anything to change ADESA's decision not to work with Empower on the Project.

## Dynamic

As Empower came to learn later, it had been swiftly replaced by Dynamic. On April 5, SolarBlue and ADESA entered into a new PPA for Dynamic's benefit (the "Revised PPA"). Under the Revised PPA, notice is required to be given by way of Cain of SolarBlue and Michael Perillo of Dynamic. While the contract was signed on April 5, it is clear that negotiations between Dynamic, SolarBlue and ADESA began much earlier. On March 3, Dynamic's Dus described the PPA as "ready to go" other than finalizing the termination values. The rate for the electricity to be sold to ADESA in the Revised PPA is precisely the rate Dynamic discussed with ADESA on March 3.

On May 4, Dynamic and SolarBlue entered into the "Dynamic APA." Empower points out that it is nearly identical to its

---

[3] The settlement proposal has not been provided to the Court.

APA, and contains similar exclusivity, confidentiality, and injunctive relief provisions to its APA.

Dynamic is one of Empower's direct competitors.  The Project represented a significant opportunity for Dynamic.  When measured by revenue, the Project is more than double the size of Dynamic's next largest completed project.  The Project will also be by far the largest carport project it has ever developed.

The Dynamic APA, which replaced Empower with Dynamic, was the culmination of about two months of effort by SolarBlue and Dynamic.  In February of 2016, SolarBlue requested that Dynamic present it with a proposal for ADESA solar power projects.  On March 1, SolarBlue gave Dynamic access to the ADESA Dataroom, which contained critical Project documents.  In working to replace Empower with Dynamic, SolarBlue gave Dynamic access to Project documents that had been created or revised by Empower, including the APA, open items lists, financial modeling, the Draft PPA, and site lease agreements.

Dynamic "repurposed" the APA for its own use.  The "Purchase Price" in the Dynamic APA, which is to be paid by the buyer (Dynamic) to the seller (SolarBlue), is identical to what Empower had agreed to pay SolarBlue in the APA.  Well aware that the APA it was working from belonged to Empower, SolarBlue noted that "the Buyer protections are pretty strong."

Additionally, with access to Empower's Draft PPA, which included Empower's electricity price and termination values, Dynamic was able to underbid Empower in making its proposal to ADESA, which it did in a March 3 telephone call with ADESA.  The termination values and electricity price in the Revised PPA are substantially more favorable than those in Empower's Draft PPA, which had an impact on ADESA's decision not to work with Empower.

On April 5, Zona's Wootan sent an email to Cain with a document titled "Project – open items."  The detailed, two-page spreadsheet lists all remaining tasks, including legal steps and regulatory permissions to be obtained from state and federal agencies, for the Project to be ready for construction.  The Open Items spreadsheet is identical, down to the "Empower Energies" logo on the top right of spreadsheet, to the spreadsheet that Empower had sent to Cain and others on March 28, except that tasks designated "EE" had been swapped out for "DE" throughout the document.  By this time, Wootan was clearly aware that Empower was out of the picture.

**Dynamic's Agreement to Pay Cain a Bribe**

In addition to SolarBlue's willingness to breach its exclusivity and confidentiality commitments to Empower, and Dynamic's willingness to assist SolarBlue in those breaches, there is another sordid element to this tale.  SolarBlue's Cain

19

requested an under-the-table payment from Dynamic in return for giving the Project to Dynamic, and Dynamic agreed to pay it. Although they characterized it variously as a referral fee, commission, or affiliate payment, it was a bribe.

On March 2, Dus wrote, in discussing the overall profitability of the Project, that "[w]e will have to make a referral payment as well," which "should be <$.10." Dus also wrote on approximately March 2 that he is "in touch directly with ADESA now," and that "[t]his is a non-competitive inside deal."

Cain and Dynamic even executed a formal document to memorialize their agreement. Bearing an effective date of February 29, 2016, the Affiliate Agreement between Dynamic and Cain entitled Cain to one percent of the gross cost of any Qualifying Project sold by Dynamic to an Identified Customer, one percent of the gross system cost for any Qualifying Project installed on Identified Land, or a fee as mutually agreed to in writing. The agreement lists three Identified Customers, one of which was ADESA with a commission of "$.10/W DC of final system size." With a project size of 4,279.24 kilowatts, the Affiliate Agreement entitles Cain to receive over $400,000 from Dynamic based on Dynamic's acquisition of rights to the Project.

When Parisi learned of this arrangement he protested to his colleagues at Dynamic that it appeared to be illegal, or at

least unethical.  As Dynamic's CFO, Parisi reviewed the draft
Dynamic APA with care and gave detailed comments on it in a
March 7 email.  Parisi noted that he was "not okay with form or
substance of the proposed 'finder's fee' for an officer of the
Seller" and reiterated that Dynamic "should not do this deal
because the 'referral fee' side-deal is not what we are about or
should be about."  Parisi testified credibly that he had
referred to the "finder's fee" as a kickback in conversations
with his colleagues.  In explaining why the Affiliate Agreement
was unethical, he wrote, "I don't think we would be okay with
compensation paid to a Dynamic employee that we don't know
about.  We would not be okay if [Dus] was paid on this deal
without our knowledge."  Parisi warned that the kickback would
violate both Dynamic's and SolarBlue's "reps, warranties, [and]
covenants" in the Dynamic APA.  He repeatedly suggested that
Dynamic have outside counsel review the APA and Dynamic's markup
of it before entering the deal.

In multiple emails on March 7, Parisi also expressed
skepticism that SolarBlue could terminate its APA with Empower.
Because Parisi knew that Dynamic's APA was based on Empower's
APA and had the same exclusivity provisions, he expressed
concern as to whether SolarBlue had "valid grounds for
termination" that would relieve SolarBlue of its duty to work
exclusively with Empower.

Parisi's concerns remained unaddressed and he resigned from Dynamic on April 4.  In his resignation letter Parisi described Dynamic's agreement to pay Cain as the crime of commercial bribery.  Parisi attached a proposed settlement agreement to his resignation letter.  On April 5, one day after Parisi resigned from Dynamic, Dynamic and Cain amended the Affiliate Agreement to remove ADESA as one of the identified customers.

**Massachusetts Tax Incentive Deadline**

Dynamic assigned its right to develop the Project in June 2016 to non-party KIIT Renewable Energy LLC ("KRE").  Dynamic continues to supervise the general contractor, a company called Conti.

To receive an incentive award from the Massachusetts tax incentive program, which reimburses certain development costs, the Project must receive permission to interconnect to the electrical grid no later than January 8, 2017.  Construction began at the Project site in early September.  The Project is on a tight timeline and even a minor delay could result in it missing the January 8 deadline.  Roland testified that enjoining Dynamic from work on the Project "would have huge ramifications," because Dynamic is supervising Conti, and has a web of contractual relationships with Project participants.  If the January 8 deadline is missed, the tax incentives will be reduced or lost, and the Project may not be completed because

the electricity price in the Revised PPA was negotiated with the tax incentives included.

## DISCUSSION

Empower has moved for a preliminary injunction against SolarBlue based on its breach of the APA and against Dynamic based on its tortious interference with that contract. Empower principally seeks a preliminary injunction that would protect its confidential information, allow it to replace Dynamic as the Project manager from this point forward, and place any proceeds from the Project that will flow to Dynamic and to SolarBlue in escrow.

To obtain a preliminary injunction, a plaintiff must show (1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, (2) that the moving party is likely to suffer irreparable injury in the absence of a preliminary injunction, (3) a balance of the hardships tipping in favor of the moving party, and (4) that the public interest would not be disserved by the issuance of a preliminary injunction. eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006); Salinger v. Colting, 607 F.3d 68, 79-80 (2d Cir. 2010). Each of these requirements shall be addressed in turn.

I. **Likelihood of Success on the Merits**

Empower asserts that SolarBlue engaged in essentially two breaches of the APA: its duty of exclusivity and its duty of confidentiality.  It also contends that Dynamic tortiously interfered with the APA.

The defendants do not dispute that Empower and SolarBlue entered into the APA, but dispute that Empower has carried its burden with respect to the remaining elements of its claims. SolarBlue asserts as well that Empower itself breached the APA by failing to obtain ADESA's consent to assignment of SolarBlue's rights in a revised PPA, which was a condition precedent to closing in the APA.  For its part, Dynamic asserts that the tortious interference claim necessarily fails because SolarBlue validly terminated the APA.[4]

After discussing the breach of contract claim, Empower's claim against Dynamic will be addressed.  Empower has carried its burden of showing a likelihood of establishing at trial that SolarBlue breached the APA and that Dynamic tortiously

---

[4] Before Dus was eliminated as a hearing witness, and his testimony stricken from the record, Dynamic had asserted that it did not tortiously interfere with the APA because Dynamic was unaware Empower was working on the very same carport project that Dynamic hoped to install for ADESA.  This contention is untenable.

interfered with the performance of the parties' obligations under the APA.

## A. Breach of Contract

The elements of a breach of contract claim under New York law are well established.[5]  They are "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004).

When a contract requires parties to maintain confidentiality, that duty encompasses a duty to protect trade secrets.  Under New York law, a trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it." Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 117 (2d Cir. 2009) (citation omitted).  To determine whether information constitutes a trade secret, New York courts consider the following:

> (1) the extent to which the information is known
> outside of the business; (2) the extent to which it is
> known by employees and others involved in the
> business; (3) the extent of measures taken by the
> business to guard the secrecy of the information; (4)
> the value of the information to the business and its

---

[5] The APA includes a choice of law clause.  It identifies New York law as the law which governs the contract.

competitors; (5) the amount of effort or money
expended by the business in developing the
information; (6) the ease or difficulty with which the
information could be properly acquired or duplicated
by others.

Id.

Information entitled to protection, however, may be broader

than trade secrets.  As the Supreme Court has observed,

[c]onfidential information acquired or compiled by a
corporation in the course and conduct of its business
is a species of property to which the corporation has
the exclusive right and benefit, and which a court of
equity will protect through the injunctive process or
other appropriate remedy.

Carpenter v. United States, 484 U.S. 19, 26 (1987) (citation

omitted); see also United States v. Mahaffy, 693 F.3d 113, 135

(2d Cir. 2012).  Moreover, a confidentiality agreement may

extend the scope of protected material beyond trade secrets.

Lehman v. Dow Jones & Co., 783 F.2d 285, 299 (2d Cir. 1986); see

also Restatement (Third) Of Unfair Competition § 42 cmt. g. (Am.

Law Inst. 1995); id. § 41 cmt. d;.  Courts may look to the

contract between the parties to help determine what information

is deemed confidential.  See N. Atl. Instruments, Inc. v. Haber,

188 F.3d 38, 47-48 (2d Cir. 1999).

Empower has demonstrated a likelihood of establishing at

trial that SolarBlue intentionally interfered with Empower's

exclusive right to develop the Project in breach of § 8.3 of the

APA and breached its duty to cooperate fully under §§ 8.2

26

and 8.12.  Empower has shown that beginning in February,
SolarBlue took steps to obtain the Project for Dynamic in breach
of the APA's obligation not to interfere and to cooperate fully
with Empower.  SolarBlue proposed to Dynamic that it make a
proposal for the Project, suggested to ADESA that it replace
Empower with Dynamic, and negotiated the Dynamic APA and Revised
PPA that gave Dynamic the rights to the Project.

In addition, during this time period, SolarBlue shared
Empower's confidential information with Dynamic, in breach of
the APA's confidentiality provisions in §§ 8.3(c) and 8.6(b).
The confidential material SolarBlue shared with Dynamic included
the purchase price payment in Schedule 3.1 of the APA, which was
copied in its entirety in the Dynamic APA, the Open Items list,
which was also copied, and the electricity rates and termination
values from the Draft PPA, which gave Dynamic insight into
Empower's pricing.  Possession of this information permitted
Dynamic to expedite its negotiations with both SolarBlue and
ADESA, to strategically underbid Empower by offering ADESA a
reduced price for the electricity, and to step quickly and
efficiently into Empower's shoes.

Empower has identified the damages it suffered as a result
of the above breaches as including the cost of the work it
performed on the Project, the alternative development
opportunities it lost in the interim because it focused its

energies on the Project, and the loss of profits it hoped to
earn from the Project.  It also asserts that its successful bid
for and completion of the Project would have helped it to earn
additional work from ADESA and other third parties.

To the extent that Empower's claimed damages hinge on its
loss of the Project, it has failed to establish that it would
have successfully completed the negotiation of a PPA with ADESA.
ADESA still refuses as of the hearing date to provide its
financial information to Empower and Empower still wants to see
that financial information before committing to this Project.

On the other hand, SolarBlue did not show that Empower
breached the APA at any time before SolarBlue sent its
termination letter to Empower.  Additionally, SolarBlue's
argument that it had a right to terminate the APA because no PPA
had been executed between Empower and ADESA fails.  The
condition precedent in the APA regarding third party consents
runs in Empower's favor only.  Thus, Empower had the right to
waive that condition and SolarBlue had no power to insist upon
it as a condition precedent to closing.

B. **Tortious Interference**

Similarly, Empower has shown a likelihood of succeeding at trial in proving that Dynamic wrongly interfered with the APA. Under New York law,[6]

> [i]n order to prevail on a cause of action for tortious interference with contractual relations, a plaintiff must establish the existence of a valid contract between plaintiff and a third party, the defendant's intentional and unjustified procurement of the third party's breach of the contract, the actual breach of the contract[,] and the resulting damages.

Katel Liab. Co. v. AT & T Corp., 607 F.3d 60, 66 (2d Cir. 2010) (citation omitted).  To show procurement of a breach, a plaintiff must establish that the actions of the defendant were a "but for" cause of the breach.  Sharma v. Skaarup Ship Mgmt. Corp., 916 F.2d 820, 828 (2d Cir. 1990); Schmidt & Schmidt, Inc. v. Town of Charlton, 962 N.Y.S.2d 393, 397 (App. Div. 2013).

Empower has shown that Dynamic was aware of the APA between Empower and SolarBlue for the Project as early as February 2016, and had a copy of the APA by early March at the latest.  Empower has also shown that Dynamic's decision to assist SolarBlue in breaching the latter's obligations to Empower, and its decision to bribe Cain with a $400,000 "referral fee," were critical to

---

[6] All parties rely on New York law in their discussions of the tortious interference claim.  This implied consent to using New York law "is sufficient to establish choice of law."  Santalucia v. Sebright Transp., Inc., 232 F.3d 293, 296 (2d Cir. 2000) (citation omitted).

SolarBlue's decision to abandon its contractual obligations to Empower and to work to present Dynamic to ADESA as an alternative partner that could step seamlessly into Empower's shoes, and give ADESA a better electricity price to boot. But for those Dynamic decisions, there is no evidence that SolarBlue would have systematically and completely abandoned its duties to Empower. The damages identified by Empower for its breach of contract claim are equally applicable here: its investments of time and money into pursuit of the Project and its lost profits. It also lost control over its confidential information, which was now in the hands of an important competitor.

## II. **Irreparable Harm**

The "showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." Faiveley, 559 F.3d at 118 (citation omitted). Empower alleges three ways that it will be harmed that cannot be compensated by money damages absent an injunction: 1) continued misuse of Empower's confidential information, 2) loss of the "sole and exclusive" development rights it bargained for in the APA, and 3) interference with Empower's future business relationship with ADESA. It emphasizes that the APA contained an acknowledgement that a breach constitutes irreparable harm.

A court may not "presume that the plaintiff will suffer irreparable harm"; rather, the plaintiff must demonstrate actual

harm that cannot be remedied later by monetary damages or a permanent injunction should the plaintiff prevail on the merits. Salinger, 607 F.3d at 80-81.  Harm may be irreparable where the loss is difficult to replace or measure, or where plaintiffs "should not be expected to suffer the loss."  Id. at 81.  "It is well established that an irreparable injury is an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation."  Dexter 345 Inc. v. Cuomo, 663 F.3d 59, 63 (2d Cir. 2011) (citation omitted).  For instance, an injury to one's reputation may not be sufficiently imminent to require issuance of a preliminary injunction.  Id.  Similarly, where the "damage flowing from the injury, in terms of lost profits, may last well into the future, that damage is compensable through monetary award."  Buckingham Corp. v. Karp, 762 F.2d 257, 262 (2d Cir. 1985).  Even "reprehensible, inequitable conduct" cannot justify a preliminary injunction where the threatened irreparable harm will not be prevented by the injunction.  Id.

The improper disclosure of confidential information may constitute irreparable injury in some circumstances.  This is so because, as a general matter, the loss "cannot be measured in money damages"; "[a] trade secret once lost is, of course, lost forever," N. Atl. Instruments, Inc., 188 F.3d at 49 (citation omitted).  But, when "a misappropriator seeks only to use those

31

secrets -- without further dissemination or irreparable impairment of value -- in pursuit of profit," there may be no showing of irreparable harm.  Faiveley, 559 F.3d at 118.  In those circumstances, "an award of damages will often provide a complete remedy for such an injury" since the misappropriator will often seek to maintain the confidentiality to profit from the information.  Id. at 118-19.

Where a contract contains an acknowledgment that a breach constitutes irreparable injury, "the Court remains obliged to make an independent determination as to whether injunctive relief is appropriate."  In re M.B. Int'l W.W.L., No. 12cv4945(DLC), 2012 WL 3195761, at *12 (S.D.N.Y. Aug. 6, 2012). Compare N. Atlantic Instruments, Inc., 188 F.3d at 49 (noting the contractual admission in its analysis of irreparable harm) and Ticor Title Ins. Co. v. Cohen, 173 F .3d 63, 69 (2d Cir. 1999) (same), with Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co., 830 F.2d 13, 16 (2d Cir. 1987) ("[C]ontractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate.").

A period of delay in bringing a motion for preliminary relief may indicate "an absence of the kind of irreparable harm required to support a preliminary injunction."  Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985).  Indeed, a lack

of diligence "goes primarily to the issue of irreparable harm rather than occasioned prejudice." Majorica, S.A. v. R.H. Macy & Co., 762 F.2d 7, 8 (2d Cir. 1985).

At the conclusion of the hearing, the defendants each agreed to the entry of an injunction forbidding their dissemination of Empower's confidential information.  As a result, there remain two types of wrongs that Empower contends demonstrate irreparable injury to it:  the loss of the exclusive rights provided to Empower in the APA and the damage to its ability to prove to ADESA through completion of the Project that it should be awarded future work.  Empower has failed to show irreparable harm on either score.

Empower's loss of the opportunity to work on the Project can be compensated through an award of money damages.  While it has lost the ability to demonstrate its excellence and capacity through its work on this Project, it is an ongoing business and has other opportunities to make that demonstration to ADESA and to others interested in the installation of solar products. Additionally, the loss of other future business opportunities for Empower is too speculative to warrant an injunction.  While the contractual clause admitting that a breach constitutes irreparable injury is entitled to weight, that clause is not sufficient in the context of the entire hearing record to make a

showing of irreparable injury to Empower absent entry of the relief it seeks.

### III. Balance of Hardships

In order to obtain a preliminary injunction, plaintiff must demonstrate that the balance of hardships tips in its favor. Salinger, 607 F.3d at 79-80.  The effect of an injunction on third parties should be considered in this balancing of the equities.  See NML Capital, Ltd. v. Republic of Argentina, 699 F.3d 246, 264 (2d Cir. 2012).

Empower has not demonstrated that the balance of hardships tips in its favor.  All of the parties, including Empower, are in agreement that no injunction should issue that would delay the Project and place at risk its opportunity to participate in the Massachusetts tax incentive program.  Dynamic, which functions as a Project manager, has entered into a web of contracts to perform that role.  Empower has not shown that it could timely negotiate a PPA with ADESA or any other party in control of the Project, or that it could quickly negotiate and execute each of the contracts that would permit it to step into Dynamic's shoes and oversee the Project.  Accordingly, the balance of hardships tips against issuance of a preliminary injunction that would allow Empower to replace Dynamic on the Project.

**IV. Public Interest**

Finally, courts must consider whether the public interest would be served by the issuance of a preliminary injunction. Salinger, 607 F.3d at 79-80.  There is a well-recognized public interest in enforcing contracts and upholding the rule of law. Advance-Rumely Thresher Co. v. Jackson, 287 U.S. 283, 288 (1932) (liberty of contract is protected by the Due Process Clause); In re Biaggi, 478 F.2d 489, 493 (2d Cir. 1973) (interest in upholding rule of law).  There is also a strong public interest in protecting the environment.  Nat'l Elec. Mfrs. Ass'n v. Sorrell, 272 F.3d 104, 115 (2d Cir. 2001) (public interest in environmental health and regulations requiring labeling of products containing mercury).

Empower has shown that an action that would deprive SolarBlue and Dynamic of the fruits of their improper conduct would be in the public interest.  Parties entering into contracts have a right to expect that those contracts will be enforced and that secretive efforts to violate contractual obligations, breach fiduciary obligations, and violate the law will not be countenanced.  On the other hand, if the Project is materially delayed because of the preliminary injunction that Empower seeks, there is a not insubstantial risk of damage to the environment.  If the Project is abandoned because the deadline for the Massachusetts' tax incentive program is missed,

35

then carbon pollution created by other sources of energy will not be ameliorated by the solar Project.  The fact that Massachusetts has put these tax incentives in place is evidence that solar energy is considered a public good.

**V. Relief Requested**

As noted above, the defendants have consented to an injunction addressed to their use of Empower's confidential information.  Empower has not shown that it is entitled to any of the other relief it seeks.  For the reasons already explained, it has not shown that at this stage of the Project, with construction ongoing, a court should or even may require Dynamic and the many affected third parties to replace Dynamic with Empower.[7]  The final relief that Empower seeks is an order that the Project funds payable to Dynamic and SolarBlue be placed in escrow pending trial.  Empower has failed to show an entitlement to that extraordinary relief as well.

As a general matter, a court may not issue a preliminary injunction preventing a defendant from disposing of its assets "in which no lien or equitable interest is claimed" pending adjudication of a contract claim for money damages, because such

---

[7] Because Empower has not shown that it is entitled to this injunctive relief, it is unnecessary to consider what notice and opportunity to be heard would have to be granted to third parties who may be adversely affected by an order seeking to replace Dynamic with Empower.

relief was not "traditionally accorded by courts of equity."
Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc., 527
U.S. 308, 310, 319, 333 (1999); see Gucci Am. Inc. v. Weixing
Li, 768 F.3d 122, 131 (2d Cir. 2014) (district court's maintain
authority post-Grupo to issue a prejudgment asset freeze "where
the plaintiff is pursuing a claim for final equitable relief");
U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc., 775 F.3d 128,
138 (2d Cir. 2014) (under Grupo, "the propriety of temporary
relief can be distinct from the final adjudication on the
merits").  Where there are persistent efforts to frustrate
collection of money judgments, and a showing that without an
injunction collection through enforcement of a judgment will be
inadequate, then a preliminary injunction to preserve assets may
be appropriate.  NML Capital Ltd., 699 F.3d at 262; Brenntag
Int'l Chemicals, Inc. v. Bank of India, 175 F.3d 245, 250 (2d
Cir. 1999); In re Feit & Drexler, Inc., 760 F.2d 406, 416 (2d
Cir. 1985).

Empower has not shown that the defendants are insolvent or
possess an intent or ability to evade efforts to collect on any
judgment it is likely to receive.  Therefore, Empower's request
that Project funds be placed in escrow pending trial is denied.

## CONCLUSION

Empower's August 23, 2016 motion for a preliminary
injunction is denied with the following exception.  The parties

were ordered to present by today a proposed injunction addressed
to use of Empower's confidential information.


Dated:     New York, New York
           September 23, 2016


                                    _____
                                              DENISE COTE
                               United States District Judge